IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| FORT WORTH 4th STREET PARTNERS, L.P., MOJITO ENERGY LLC, KSM MINERALS, LLC, 4th STREET MINERALS, LLC, and REILLY FAMILY MINERALS, LLC, | § § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | No. 3:14-cv-03871-M |
| CHESAPEAKE ENERGY CORP., CHESAPEAKE OPERATING, LLC, CHESAPEAKE EXPLORATION, LLC as successor by merger to CHESAPEAKE EXPLORATION, LP, and CHESAPEAKE LAND COMPANY LLC, | § § § § § § § | |
| Defendants. | § § | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel H. Charest
State Bar No. 24057803
Warren T. Burns
State Bar No. 24053119
Will Thompson
State Bar No. 24094981
BURNS CHAREST LLP
500 North Akard Street, Suite 2810
Dallas, Texas 75201
Telephone: (469) 904-4550
Facsimile: (469) 444-5002
dcharest@burnscharest.com
wburns@burnscharest.com
wthompson@burnscharest.com

Attorneys for Plaintiffs

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................i

TABLE OF AUTHORITIES ..........................................................................................iii

I.     SUMMARY—SCOPE OF MOTION ...............................................................1

II.    MATERIAL FACTS .........................................................................................1

    A.    Agreements and Parties. .......................................................................1

        1.    Surface Use Agreement and Fourth Street Lease—FWP contracts with Dale Resources ...........................................2

        2.    Surface Sale, Bunge Lease, and Master Amendment—FWP contracts with Chesapeake ..............................................2

    B.    Chesapeake Exploration, through Chesapeake Operating, gas to an affiliate under a contract that deducts post production expenses to calculate price. ......................................................................4

III.   LEGAL STANDARD ........................................................................................7

    A.    Summary Judgment. ............................................................................7

    B.    Oil and Gas Leases .............................................................................7

    C.    Royalty Claims. ...................................................................................8

IV.   ARGUMENT ...................................................................................................11

    A.    The Chesapeake defendants must satisfy the deferred payment obligation. .........................................................................................11

        1.    The SUA's plain language (as supported by the parties' intent) requires the Chesapeake defendants to fulfill the deferred payment obligation. ........................................................11

        2.    The sale of the surface does not eliminate the deferred payment obligation.........................................................................12

        3.    The deletion of the terms Operation Site, Central Facility, and Water Supply Tank does not eliminate the deferred payment payment obligation. .............................................................14

        4.    The Chesapeake defendants owe $1,968,845.67 for 834,448.95 square feet of occupied land. ............................................17

    B.    The Chesapeake defendants underpaid royalty and overriding royalty payments to the landowner plaintiffs. ...............................................17

        1.    All royalty and overriding payments follow the same design............17

        2.    The proceeds received by Chesapeake Marketing sets a minimum royalty ...........................................................18

3.      Even if not surplusage, the Chesapeake defendants cannot take deductions because the lessee—Chesapeake Exploration—does not actually incur transportation costs. ............................21

   i.     All post-production expenses arise after title passes to Chesapeake Marketing at the wellhead. ...................................................22

   ii.    The Chesapeake defendants have argued that Chesapeake Marketing, not Chesapeake Exploration, incurs all post production costs. ...........................................23

4.      The Chesapeake defendants owe the landowner plaintiffs $901,342.27 through May 2015 production, with interest through August 31, 2015. .......................................................24

   i.     Single damages measure $450,671.14 through May 2015 for royalty and overriding royalty underpayments...........................................................24

   ii.    The leases provide for double damages for wrongful deductions. ..........................................................24

IV.   CONCLUSION ...........................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) ...................................................................7

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..............................................................7

*Blackmon v. XTO Energy, Inc.*, 276 S.W.3d 600 (Tex. App. Waco 2008) ...............................22

*Bowden v. Phillips Petroleum Co.*, 247 S.W.3d 690 (Tex. 2008) .............................................21

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ................................................................7

*Clardy Mfg. Co. v. Marine Midland Bus. Loans Inc.*, 88 F.3d 347 (5th Cir. 1996) ..................7

*Exxon Corp. v. Middleton*, 613 S.W.2d 240 (Tex. 1981) ........................................................22

*Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118 (Tex. 1996) ..................................8, 9, 10

*Houston Expl. Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462 (Tex. 2011) .......................12

*In re G.D.H.*, 366 S.W.3d 766 (Tex. App.—Amarillo 2012, no pet.) .......................................15

*Lind v. Int'l Paper Co.*, No. 13-cv-249, 2014 U.S. Dist. LEXIS 116412 (W.D. Tex. Aug. 21, 2014) ...............16

*Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994) .........................................................7

*Oakrock Exploration Co. v. Killam*, 87 S.W.3d 685 (Tex. App.—San Antonio 2002, pet. denied) ..........................14

*Potts v. Chesapeake Exploration, L.L.C.*, 760 F.3d 470 (5th Cir. 2014) ..............................passim

*Potts v. Chesapeake Exploration, L.L.C.*, No. 3:12-cv-1596, 2013 U.S. Dist. LEXIS 33264 (N.D. Tex. Mar. 11, 2013) ..................9, 23

*Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455 (5th Cir. 1998)) .............................................7

*Tanner Dev. Co. v. Ferguson*, 561 S.W.2d 777 (Tex. 1977)) ...............................................13

*Tittizer v. Union Gas Corp.*, 171 S.W.3d 857 (Tex. 2005) ....................................................7

*Topalian v. Ehrman*, 954 F.2d 1125 (5th Cir. 1992) ...............................................................7

*Trinity Valley School v. Chesapeake Operating, Inc.*, No. 13-cv-1082, 2015 U.S. Dist.

   LEXIS 109874 (N.D. Tex. Aug. 19, 2015) ......................................................... 8, 21

*Union Pac. Res. Grp. v. Hankins*, 111 S.W.3d 69 (Tex. 2003) ......................................21

*United States v. Diebold, Inc.*, 369 U.S. 654 (1962) ...................................................7

*Warren v. Chesapeake Exploration, L.L.C.*, 759 F.3d 413 (5th Cir. 2014).......................21

*XCO Prod. Co. v. Jamison*, 194 S.W.3d 622 (Tex. App.—Houston 14th Dist. 2006).............16

*Yturria v. Kerr-Mcgee Oil & Gas Onshore, LLC*, 291 F. App'x 626 (5th Cir. 2008) .....................8

## RULES

Fed. R. Civ. P. 56(c).................................................................................6

## MEMORANDUM IN SUPPORT OF PLAINTIFFS'
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Fort Worth 4th Street Partners, LP, et al. (collectively, the "landowner plaintiffs") respectfully move the Court for partial summary judgment against Chesapeake Energy Corp., Chesapeake Operating, LLC, Chesapeake Exploration, LLC as successor by merger to Chesapeake Exploration, LP, and Chesapeake Land Company LLC (collectively, the "Chesapeake defendants") with respect the limited issues raised in this motion. While other issues remain at issue for trial, the Court can resolve the obligations presented here and resulting damages on summary judgment.

### I.        SUMMARY—SCOPE OF MOTION

The landowner plaintiffs hold royalty interests, overriding royalty interests, and working interests relating to 49 producing gas wells in an urban portion of the Barnett Shale. The Chesapeake defendants have ignored or misapplied key provisions of the agreements that define the relationship between the parties in this action. The Chesapeake defendants have underpaid royalty and overriding royalty payments. And the Chesapeake defendants have refused to honor a deferred payment obligation relating to the amount of surface the Chesapeake defendants occupied over certain leased lands. Through this motion, the landowner plaintiffs move for partial summary judgment with respect to these failures.

### II.        MATERIAL FACTS

**A.        Agreements and Parties.**

This motion for partial summary judgment involves the interpretation and application of four agreements. For the most part, Fort Worth 4th Street Partners ("FWP") stands as the contracting party for the landowner plaintiffs and Chesapeake Exploration stands as the counterparty (by assignment) on the agreements.

1.     **Surface Use Agreement and Fourth Street Lease—FWP contracts with Dale Resources.**

On December 7, 2005, FWP leased just over 54 acres of minerals to Dale Resources LLC ("Dale") under an oil and gas lease ("Fourth Street Lease").[1] Under the Fourth Street Lease, FWP stood as the Lessor and Dale stood as the Lessee. Fourth Street Lease, at 1. App. 001. That same day, the same parties entered into the Surface Use Agreement ("SUA") to address other aspects of the relationship between FWP and Dale.[2] Under the SUA, FWP stood as the Surface Owner and Dale stood as the Working Interest Owner. SUA, at 1. App. 019. The SUA addressed, in detail, the limitations on surface use associated with Dale's anticipated drilling operations. *See generally* SUA ¶¶ 1-13 (detailing the number and extent of "Operation Sites," "Water Supply Tank," and "Central Facility" permitted). App. 019-025. The beneficial owners of FWP required strict limits on the nature of surface use because, at the time, they intended to develop the remaining portion of the Forth Street Lands for residential use. *See* Declaration of Jeffrey Brawner (Sept. 11, 2015) ("Brawner Dec."), at ¶ 4; *see also* Conceptual Site Plan (showing proposed residential plans along with Operation Sites, Water Supply Tanks, and Central Facilities) App. 227.[3] In a separate provision, the SUA reflected that anticipated use. *See* Brawner Dec., at ¶ 4. The SUA provided that Dale would make a deferred payment to FWP six years after the SUA's effective date for any lands within the surface that Dale occupied through its operations:

> On or before the expiration of six (6) years from the date of this Surface Use Agreement (the 'Damage Payment Date'), the Working Interest Owner shall pay to the Surface Owner a sum equal to Six Dollars ($6.00) per square foot (the 'Base Price') for each square foot included in an Operation Site, the Central Facility, the Water Supply

---

[1] The relevant instruments are attached to the Declaration of Daniel H. Charest, filed concurrently with this motion. The Fourth Street Lease is attached as Exhibit 1 (App. 001-18).

[2] The SUA is attached as Exhibit 2 (App. 019-47).

[3] The Brawner Declaration is filed concurrently with this motion. The Conceptual Site Plan is attached as Exhibit 15 (App. 227).

> Pit and all roads and pipeline easements appurtenant to any of the same (collectively the 'Occupied Lands'); provided, however, if, before the Damage Payment Date, Working Interest Owner has drilled and completed at least eight (8) wells on and from an Operation Site, then the 'Base Price' shall be reduced from Six Dollars and No/100 ($6.00) per foot to Three Dollars and No/100 ($3.00) per foot.

SUA ¶ 17. App. 030. The deferred payment obligation served as part of the consideration for the overall SUA including, without limitation, permitting Dale to use of the Fourth Street Lands as a surface location for Dale's anticipated drilling operations. *See* Brawner Dec., at ¶ 5.

### 2.   Surface Sale, Bunge Lease, and Master Amendment—FWP contracts with Chesapeake.

On June 29, 2007, FWP entered into a sale agreement with Chesapeake Land Company. This agreement provided for the sale of the surface of the land covered by the Fourth Street Lease and, in addition, just over 29 acres of land northwest of the Fourth Street lands, known as the Bunge lands. FWP reserved the mineral interests under both properties.[4] One week later, FWP and Chesapeake Exploration entered into an oil and gas lease for the minerals under the Bunge lands (the "Bunge Lease") See Exh. 4, App. 081-108.  The Bunge Lease contains royalty provisions that mirror those of the Fourth Street Lease.

In and around the same time, Chesapeake Exploration succeeded to the interest of Dale both, generally, across many properties in the Barnett Shale and, specifically, under the Fourth Street Lease and the SUA.[5] Concurrent with this transfer, the landowner plaintiffs and the Chesapeake defendants entered into an agreement that amended the Fourth Street Lease and the SUA among other contracts (the "Master Amendment").[6]

---

[4] The sale agreement is attached as Exhibit 3 (App. 195-227).

[5] Master Amendment, at 2 (describing the permutations of Chesapeake Exploration). App. 110.

[6] The Master Amendment is attached as Exhibit 5 (App. 109-150).

The Master Amendment removed restrictions on how the Chesapeake defendants could use the surface of the Fourth Street Lands and reduced the size of overriding royalties due to FWP. *See* Master Amendment ¶¶ 2(A)-(B). App. 111-112. To reflect the elimination of surface use restrictions, the Master Amendment deleted certain paragraphs from the SUA. *See* Master Amendment ¶¶ 2(A)-(B). App. 111-112. But the parties intentionally left the payment obligation untouched in the SUA.

The parties to the Master Amendment made certain that the sale of the surface did not alter the underlying duties in the SUA by "acknowledg[ing] and agree[ing] that the terms and provisions of [the SUA], as amended [in the Master Amendment], shall remain in full force and effect notwithstanding the fact that [one of the Chesapeake defendants] has acquired fee simple title to the surface of the [Fourth Street] Lands." Master Amendment ¶ 4.I. App. 117. And, to the extent any remaining terms in the SUA required modification or amendment, the parties agreed to modify or amend them to match the changes from the Master Amendment: "Any and all of the terms and provisions of [the SUA] are hereby amended and modified wherever necessary, and even though not specifically addressed herein, so as to conform to the amendments set forth in the[e] [Master] Amendment." Master Amendment ¶ 4.H. App. 116. Despite this clear contractual language requiring the Chesapeake defendants, in privity with Dale, to pay the deferred consideration, the Chesapeake defendants have refused to pay.

**B.    Chesapeake Exploration, through Chesapeake Operating, sells gas to an affiliate under a contract that deducts post-production expenses to calculate price.**

The Chesapeake defendants sell production from the relevant lands to Chesapeake Energy Marketing, Inc. ("Chesapeake Marketing") under a blanket agreement between Chesapeake Operating and Chesapeake Marketing (the "Chesapeake gas-purchase contract").[7] By virtue of the

---

[7] The Chesapeake gas-purchase contract is attached as Exhibit 6 (App. 151-160). *See also Trinity Valley Sch. v. Chesapeake Operating, Inc.,* No. 13-cv-1082, 2015 U.S. Dist. LEXIS 109874, at *13 (N.D.

Chesapeake gas-purchase contract, neither Chesapeake Operating nor Chesapeake Exploration—the lessee under the relevant leases—pays any of the post-production expenses. Rather, after Chesapeake Marketing incurs the post-production expenses, Chesapeake Marketing calculates the price it pays to Chesapeake Operating by deducting the expenses it incurred from the price it obtained for the sale of the gas:

> Contract Price: 97% of the applicable Chesapeake Energy Marketing, Inc. WASP[8] for each delivery point less Seller's proportionate share of actual fuel and actual cost of any applicable fees incurred [by Chesapeake Marketing] in marketing such production including, but not limited to, fees for compression, dehydration, gathering, transportation, treating or processing.

Chesapeake gas-purchase contract, at 10. App. 160. The provisions of the Chesapeake gas-purchase contract establish two core facts that control the application of royalty and overriding royalty payments. And the Chesapeake defendants cannot dispute these facts.

    1.    <u>"Lessee realizes proceeds of production after deduction for [post-production expenses]</u>." By its terms, the Chesapeake gas-purchase contract deducts "marketing" as well as the cost or "compression, dehydration, gathering, transportation, treating[, and] processing" from the WASP to arrive at the price Chesapeake Marketing pays the Lessee. Chesapeake gas-purchase contract, at 10. App.160. Because it sells the gas associated with FWP's royalties and overriding royalties pursuant to the Chesapeake gas-purchase contract, the "Lessee realizes proceeds of production after deduction for any expenses of . . . gathering, dehydration, separation, compression, transportation, treatment, processing, storage or marketing." 4th Street Lease, at ¶ 3.C. App. 002-03.; Bunge Lease, at ¶ 3.C. App. 082-83. *See also* Defendants' Amended Responses and Answers to Plaintiffs' First Set of Discovery Requests ("Chesapeake Discovery Responses"), Response to

---

Tex. Aug. 19, 2015) (discussing the Chesapeake gas-purchase contract). A slip copy of the memorandum and order from *Trinity Valley* is attached as Exhibit 7 (App. 161-178).

[8] Chesapeake Marketing's "WASP" represents a "weighted average sales price" for all Chesapeake Marketing sales from the Barnett Shale for a given month.

Interrogatory No. 7 ("[Chesapeake Operating] is paid based on [Chesapeake Marketing]'s sales to third-parties less [Chesapeake Operating]'s share of the actual post-production costs to get the production from the well to the point of sale.") App. 186.; Chesapeake Discovery Responses, Response to Request for Admission No. 9 ("Per [Chesapeake Marketing]'s contract with [Chesapeake Operating] on behalf of [Chesapeake Exploration], [Chesapeake Operating] is paid based on 97% of the proceeds from sales by [Chesapeake Marketing] to third parties <u>less [Chesapeake Operating]'s share of actual post-production costs from the well to the downstream points of sale</u>." (emphasis added)), Ex. 8, App. 182.[9]

2.  <u>Transportation costs not "actually incurred by Lessee</u>." The nature of the Chesapeake gas-purchase contract demonstrates that Chesapeake Marketing, not Chesapeake Exploration, actually incurs the costs for "transporting gas from the leased premises." Fourth Street Lease, at 3.C.; Bunge Lease, at 3.C. App. 002-03; App. 083-83; *see also* Chesapeake Discovery Responses, Response to Interrogatory No. 7 ("[Chesapeake Marketing] contracts for gathering, treating, processing, and transportation services and deducts or subtracts [Chesapeake Operating]'s share of these postproduction costs from proceeds paid [to Chesapeake Operating].") App. 186; *Trinity Valley*, 2015 U.S. Dist. LEXIS 109874, at *15 (addressing an identical transaction and concluding that the lessee did not incur costs).

These core facts, as discussed below, drive the application of the no-deduction provisions in this case. The Chesapeake defendants ignored key provisions of the leases, which forbid deductions in these circumstances. And the Chesapeake defendants' payments of the royalties, under their flawed application of the leases, fell short of their obligations.

---

[9] Chesapeake Discovery Responses are attached as Exhibit 8 (App. 179-192).

### III.      LEGAL STANDARD

**A.      Summary Judgment.**

The Court should grant summary judgment where, as here, the pleadings, affidavits, and other summary judgment evidence show that no genuine issue of material fact exists and the law entitles the moving party to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). As the moving party, the landowner plaintiffs bear the burden of identifying portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 322-25. Once satisfied, the burden shifts to the Chesapeake defendants, as nonmovants, to show that the Court should not grant summary judgment; the nonmovants must support the position with summary judgment evidence that shows the existence of a genuine fact issue for trial. *Id.* at 321-25; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-57 (1986).

For the purposes of this motion, the Court must view all evidence and reasonable inferences in the light most favorable to the Chesapeake defendants, as nonmovants. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). While the Court must view all of the evidence in a light most favorable to the motion's opponent, *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)), neither conclusory allegations nor unsubstantiated assertions will satisfy the nomovant's summary judgment burden. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992). "[T]he party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

**B.      Oil and Gas Leases.**

The Court should look to Texas law to interpret the leases. *See generally Potts v. Chesapeake Exploration, L.L.C.*, 760 F.3d 470, 473 (5th Cir. 2014) [*Potts II*] (citing *Clardy Mfg. Co. v. Marine*

*Midland Bus. Loans Inc.*, 88 F.3d 347, 352 (5th Cir. 1996)). Under Texas law, "[a]n oil and gas lease is a contract, and its terms are interpreted as such." *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 860 (Tex. 2005) (per curiam).

For the purposes of this motion, the landowner plaintiffs contend that the relevant contract terms are unambiguous. "In construing an unambiguous oil and gas lease our task is to ascertain the parties' intentions as expressed in the lease." *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). The Court should "examine the entire document and consider each part with every other part so that the effect and meaning of one part on any other part may be determined." *Id.* And Courts should "give terms their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense." *Id.* As a general principle, Texas law instructs that, when faced with "equally reasonable interpretations" for oil and gas leases, courts should "adopt the interpretation more favorable to the lessor." *Yturria v. Kerr-Mcgee Oil & Gas Onshore, LLC*, 291 F. App'x 626, 631 (5th Cir. 2008) ("If, after applying the pertinent rules of construction, the lease remains subject to two or more equally reasonable interpretations, Texas cases counsel that we adopt the interpretation more favorable to the lessor."); *see also Trinity Valley*, 2015 U.S. Dist. LEXIS 109874, at *7, 18 (relying on *Yturria*). (Ex. 7 at App. 165).

## C.    Royalty Claims.

The most recent Fifth Circuit royalties opinion of note, *Potts II*, sets the backdrop for this matter. In *Potts II*, the Fifth Circuit affirmed summary judgment against the mineral owner in favor of Chesapeake Exploration. *See Potts II*, 760 F.3d at 471. As it should here, the language in the disputed lease drove the *Potts II* court's analysis.

The lease in *Potts II* had three disputed provisions, but only two (Paragraphs 11 and 37) merit discussion. *See id.* at 471-72. Paragraph 11 provided that royalties were to be paid on "the market value at the point of sale" of the gas. *Id.* at 471. That same paragraph went on to say that "all

royalty" paid under the lease were to be "free of all costs" related to a list of enumerated post-production expenses. *Id.* at 471-72. By contrast, Paragraph 37 provided that royalty payments were to be made based on "sales of leased substances to unrelated third parties at prices arrived at through arms length negotiation." *Id.* at 472. Paragraph 37 continued and provided that "[r]oyalties to Lessor or leased substances not sold in an arms length transaction shall be determined based on prevailing values at the time in the area." *Id.*

The parties adjudicated the matter on the following agreed facts:

> An affiliate of Chesapeake [Exploration], Chesapeake Operating, Inc. (COI), operates the lease on Chesapeake's behalf. COI, as agent for Chesapeake, sells gas produced from the lease to Chesapeake Energy Marketing, Inc. (CEMI), another affiliate of Chesapeake, at the wellhead located on the lessors' property. CEMI then transports the gas through a gathering system and resells it to unaffiliated purchasers at gas pipeline hubs that are considerable distances from the wellhead. The sales to unaffiliated purchasers occur at delivery points that include the Houston Ship Channel and locations in Louisiana and Alabama. CEMI pays Chesapeake the weighted average sales price that CEMI receives when it sells the gas downstream, after deducting post-production costs that CEMI incurs between the wellhead and the points at which deliveries to unaffiliated purchasers occur. The royalty that Chesapeake pays to the lessors is 1/4 of the price it receives from CEMI.

*Id.* For the purposes of this motion, these agreed facts are materially similar to the facts adduced in discovery, except the method of calculating plaintiffs' royalties (which are described above).[10]

The *Potts II* court looked to *Heritage Resources* as the fundamental source for Texas law on the interpretation of royalty provisions. *See Potts II*, 760 F.3d at 474-76 (discussing *Heritage Resources* in

---

[10] Because the parties proceeded on agreed facts, *see Potts v. Chesapeake Exploration, L.L.C.*, No. 3:12-cv-1596, 2013 U.S. Dist. LEXIS 33264, *4 (N.D. Tex. Mar. 11, 2013) [*Potts I*] App. 232-42., the plaintiffs did not have the benefit of discovery. And it appears that the plaintiffs in *Potts I* challenged neither the reasonableness of the post-production costs nor the efficacy of the Chesapeake Marketing sales to third-parties. While the *Potts I* facts generally align with the facts discovery has yielded, the landowner plaintiffs do not waive any such challenges.

detail and noting that *Heritage Resources* "remains binding law").[11] Because the lease language called for the measurement of market value at the point of sale—the wellhead—the *Potts II* court concluded that Chesapeake Exploration "could arrive at the market value at the wellhead by deducting reasonable post-production costs to deliver the gas from the wellhead to the point at which the gas was sold to unaffiliated purchasers." *Potts II*, 760 F.3d at 474. Netting back the post-production costs allowed Chesapeake Exploration to value the gas at the point of sale, in conformance to the lease's Paragraph 11. *See id.*

As to the "free of costs" portion of Paragraph 11, the Court discussed *Heritage Resources* and said that the "free of costs" provision only restated existing law in that the provision measured the market value at the location of the sale: "The deduction of post-production costs incurred between the wellhead and a downstream point at which market value could be ascertained was nothing more than a method of determining market value at the well in the absence of comparable sales data at or near the wellhead." *Potts II*, 760 F.3d at 475 (citing *Heritage Resources*, 939 S.W.2d at 130 (Owen, J., concurring)).

With respect to Paragraph 37, the *Potts II* court looked past the plaintiffs' assertion that the royalty should be based on third party sales (the first sentence of Paragraph 37) because the subsequent sentence provided that, in the absence of a third-party sale, the royalty was to be "determined based on prevailing values at the time in the area." *Id.* at 475-76. This provision, the *Potts II* court concluded, called for the market value to be determined at the wellhead because that was "the area" of the sale. *Id.* at 476. The *Potts II* court rejected the concern that an interpretation would "frustrate the parties' expectations" because the court deemed the provision "clear." *Id.*

The Court pointed to the plain language of the lease as the ultimate guide:

---

[11] Judge Owen authored *Potts II* and, while a Texas Supreme Court Justice, a concurring opinion in *Heritage Resources*.

> The concurring opinion [in *Heritage Resources*] emphasized that the parties to a lease "may allocate costs . . . as they choose" and that courts must examine the specific language chosen in order to "determine how . . . costs were allocated under [the] particular leases" at issue.

*Potts II*, 760 F.3d at 475 (quoting *Heritage Resources*, 939 S.W.2d at 124 (Owen, J., concurring)).

## IV.        ARGUMENT

**A.        The Chesapeake defendants must satisfy the deferred payment obligation.**

  **1.        The SUA's plain language (as supported by the parties' intent) requires the Chesapeake defendants to fulfill the deferred payment obligation.**

In plain terms, the SUA establishes the deferred payment, the parties involved, the amount to be paid, and the date of payment:

> On or before the expiration of six (6) years from the date of this Surface Use Agreement (the "Damage Payment Date"), the Working Interest Owner shall pay to the Surface Owner a sum equal to [Three] Dollars ($[3].00) per square foot (the "Base Price") for each square foot included in an Operation Site, the Central Facility, the Water Supply Pit and all roads and pipeline easements appurtenant to any of the same (collectively the "Occupied Lands"). . . .[12]

SUA ¶ 17. App.030.

Just as plainly, the SUA defines Surface Owner as FWP and Working Interest Owner as Dale. *See* SUA, at 1. Further, the "date of the [SUA]" was December 7, 2005. SUA, at 1 (setting the effective date). Finally, the record establishes beyond doubt that Chesapeake Exploration stands in the shoes of Dale—and therefore the Working Interest Owner—under the SUA. *See* Master Amendment, at 2. App. 110. ("WHEREAS, Chesapeake Exploration Limited Partnership ('CELP') succeeded to the interest of Dale Resources, L.L.C. in and to . . . the [SUA]. . . ."). The obligation to make the deferred payment under the SUA, then, falls to Chesapeake Exploration. To date, the deferred payment has not been satisfied. *See* Brawner Decl., at ¶ 7. And the Chesapeake defendants

---

[12] Sufficient wells have been drilled to qualify for the $3 per square foot measurement. *See* SUA ¶ 17. App. 030.

have refused to honor the payment commitment under the SUA. The Chesapeake defendants have articulated two arguments against the payment obligation. But none can stand.

### 2.    The sale of the surface does not eliminate the deferred payment obligation.

In response to discovery requests, the Chesapeake defendants have asserted that, because Chesapeake Land bought the surface, the Chesapeake defendants are relieved of the obligation to satisfy the deferred payment. *See* Chesapeake Discovery Responses, Response to Interrogatory No. 10 ("Defendants have not treated Plaintiffs as the surface owner of the 4th Street Lands under the SUA as amended by the Master Amendment because Plaintiffs sold their surface rights and Plaintiffs' rights to surface use are limited to the rights granted to Non-Operators under the Joint Operating Agreement"). This argument ignores the contractual language, the commercial realities of the relationship, and the intent of the parties.

First, the Master Amendment forbids this argument: "The parties hereto acknowledge and agree that the terms and provisions of [SUA], as amended hereby, shall remain in full force and effect notwithstanding the fact that [one of the Chesapeake defendants] has acquired fee simple title to the surface of the [Fourth Street] Lands." Master Amendment ¶ 4.I. Simply put, the mere sale of the surface does not—as the Chesapeake defendants contend—alter the other provisions of the SUA. The parties could not have been more clear. And, as further evidence of the parties' understanding in this regard, the Chesapeake defendants have assigned (or paid pending delivery of the recorded assignments) overriding royalties to FWP (or its designees) for over twenty producing gas wells. *See* Brawner Decl., at ¶ 7. The obligation to do so comes from the SUA—as between the Working Interest Owner and the Surface Owner. *See* SUA ¶ 14. The sale of the surface did not eliminate that duty. Nor does it eliminate the deferred payment obligation.

Second, the history of the negotiation supports the obligation. *See Houston Expl. Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469-470 (Tex. 2011) ("As we have said,

'[n]egotiations of the parties may have some relevance in ascertaining the dominant purpose and intent of the parties embodied in the contract interpreted as a whole.'" (quoting *Tanner Dev. Co. v. Ferguson*, 561 S.W.2d 777, 781 (Tex. 1977)). The parties to the SUA agreed to defer the payment until six years after its effective date. But that payment made up an important element of the decision to grant Dale the SUA. *See* Brawner Decl., at ¶ 5. Without that consideration, FWP would have obtained other concessions or consideration. *See* Brawner Decl., at ¶ 5. To ignore the original deal, as the Chesapeake defendants would, overlooks the intent of the parties.

Third, the parties to the Master Amendment intended to eliminate surface use restrictions but not the deferred payment obligation. The Master Amendment clearly demonstrates the parties' intent to eliminate surface use restrictions:

> Elimination of Surface Use Restrictions. From and after the effective date of this Amendment, FWP shall no longer be entitled to restrict or limit where or how operations for drilling, operating and producing oil, gas or other minerals under the Lease are conducted. Therefore, any provision of the Surface Agreement which purports to limit or restrict the "Working Interest Owner's" right to enter upon or use any portion of the surface of the FWP Lands are hereby deleted and terminated, including, but not limited to Paragraphs 1 through 13 thereof, it being the expressed intention of this Amendment that, from and after the effective date hereof, the owner(s) of the working interest arising under the Lease shall be entitled to use so much of the surface of the FWP Lands as may be reasonably necessary to develop the oil, gas and other minerals therein, under and pursuant to the Lease; provided, however, Non-Operators and their successors and assigns right to use the surface of the FWP Lands shall be limited to the rights granted to Non-Operators under the Joint Operating Agreement.

Master Amendment ¶ 2.A. App. 111-112.

Just as the drafters clearly intended to eliminate surface use <u>restrictions</u>, they left no doubt that the decision to maintain the surface use <u>payment obligation</u> meant that the obligation remained in full force and effect: "Except as otherwise amended hereby, any and all terms and provision of [the SUA] shall remain in full force and effect." Master Amendment ¶ 4.H. This provision only

underscores the obvious answer: if the parties did not eliminate the payment obligation, it remains. If the parties to the Master Amendment had intended to eliminate the deferred payment obligation, they could have deleted paragraph 17 in the SUA. The provision literally serves no purpose except to memorialize the deferred payment obligation. *See* SUA ¶ 17 (addressing only the deferred payment obligation). App. 030. The Chesapeake defendants' argument represents a desperate end run on the obvious obligation.

### 3.   The deletion of the terms Operation Site, Central Facility, and Water Supply Tank does not eliminate the deferred payment obligation.

The Chesapeake defendants argue, in discovery responses, that "the term 'Occupied Lands' as set forth in Paragraph 17 of the SUA is moot because the defined terms describing Occupied Lands [e.g., Operation Site, Central Facility, and Water Supply Tank] have been deleted by the parties under the Master Amendment and, accordingly, the definition Plaintiffs rely upon does not exist." Chesapeake Discovery Responses, Response to Interrogatory No. 10; App. 187. *see also* Chesapeake Discovery Responses, Response to Interrogatory No. 6 (asserting that, "'Occupied Lands' is not capable of definition due to the deletion of the defined terms [e.g., Operation Site, Central Facility, and Water Supply Tank] it was originally intended to encompass" (emphasis added)). App. 185. The Chesapeake defendants' argument would eliminate a multi-million-dollar payment obligation because—in the Chesapeake defendants' view—a term "is not capable of definition." Chesapeake Discovery Responses, Response to Interrogatory No. 6. The argument fails for several reasons.

First, the Chesapeake defendants' argument misses the fact that the definitions for two terms—Central Facility and Water Supply Tank—remain untouched by the Master Amendment. Second, Texas law does not eliminate an obligation for lack of a definition because the "missing" term (Operational Site) remains capable of definition—and without too much effort. *See Oakrock*

*Exploration Co. v. Killam*, 87 S.W.3d 685, 690 (Tex. App.—San Antonio 2002, pet. denied) ("[A] court may uphold an agreement by supplying missing terms."); *see also In re G.D.H.*, 366 S.W.3d 766, 770 (Tex. App.—Amarillo 2012, no pet.) (recognizing the court's power to supply terms to an already existing contract). The SUA does define Occupied Lands by reference to Operation Sites, Central Facility, and Water Supply Tank. *See* SUA ¶ 17. But the Court can readily appreciate the definition the parties intended to apply to those underlying terms and, therefore, the term Occupied Lands.

**Not Deleted Terms.** The SUA defines Central Facility in paragraph 16(a). *See* SUA ¶ 16(a) ("Such approximately 1.0 acre site shall be used by the Working Interest Owner for the sole purpose of constructing, maintaining and operating a natural gas facility for the separating, treating, dehydration and compression of gas produced from an Operation Site (the 'Central Facility')"). And the SUA defines Water Supply Tank/Pit in the following section. *See* SUA § 16(b) ("Such one and one-half (1.5) acre site may be used by the Working Interest Owner for the sole purpose of constructing, maintaining and operating a water supply and flow back tank (the 'Water Supply Tank') for use in connection with drilling and completion operations on wells drilled on or from an Operation Site."). Neither of those paragraphs are altered by the Master Amendment, except insofar as they limit the Working Interest Owner's ability to use the surface. *See generally* Master Amendment ¶ 2 (amending the SUA and identifying only ¶¶ 1-14 expressly). Regardless, the two terms mean exactly what their names imply: a natural gas facility for the separating, treating, dehydration and compression of gas and a water supply and flow back tank for use in connection with drilling and completion operations.

**Deleted Term.** Even if the term Operation Site lacked any definition in the underlying agreements, the Court could look to the ordinary and generally accepted meaning of the phrase or, if necessary, to extrinsic sources to define the term:

> When a term is not specifically defined by a contract a court must give the term its "plain, ordinary and generally accepted meaning," unless the contract itself shows it to have been used in a different sense. *Mescalero Energy, Inc. v. Underwriters Indem. Gen. Agency, Inc.*, 56 S.W.3d 313, 320 (Tex. App.—Houston [1st Dist.] 2001, pet. denied). On the other hand, when the contract defines a term, a court may not "disregard those definitions and substitute other meanings." *Healthcare Cable Sys., Inc. v. Good Shepherd Hosp., Inc.*, 180 S.W.3d 787, 791 (Tex. App.—Tyler 2005, no pet.). Even when a term is not defined, "courts may refer to extrinsic evidence such as industry dictionaries or statutory definitions to determine the commonly understood meaning" of the term. *Mescalero Energy*, 56 S.W.3d at 323 (citing *Amarillo Oil Co. v. Energy-Agri Products, Inc.*, 794 S.W.2d 20, 23 n.3 (Tex. 1990)). Numerous courts have appealed to such "outside" definitions to interpret a contract term. *See, e.g., Heritage Resources, Inc. v. Nationsbank*, 939 S.W.2d 118, 121-22 (Tex. 1996); *Ramsay v. Maryland American General Ins. Co.*, 533 S.W.2d 344, 346 (Tex. 1976). *See also Topp, Inc. v. Uniden America Corp.*, 2007 U.S. Dist. LEXIS 84032, 2007 WL 3256849 at *3 (S.D. Fla. Aug. 23, 2007) (applying Texas law).

*Lind v. Int'l Paper Co.*, No. 13-cv-249, 2014 U.S. Dist. LEXIS 116412, *35-36 (W.D. Tex. Aug. 21, 2014); *XCO Prod. Co. v. Jamison*, 194 S.W.3d 622, 627-28 (Tex. App.—Houston 14th Dist. 2006) ("In determining whether a contract is ambiguous, we look to the contract as a whole, in light of the circumstances present when the contract was executed. These circumstances include the commonly understood meaning in the industry of a specialized term, which may be proven by extrinsic evidence such as expert testimony or reference material."). The lack of a definition does not, as the Chesapeake defendants assert, terminate any obligation.

To determine the definition of Operation Site, the Court need look no further than the SUA itself. Paragraph 3 defines the term by reference to the site plan attached to the SUA, which projects two locations of approximately three acres each. *See* SUA ¶ 3. And the context of the permitted use explains function of the Operation Sites: "The Working Interest Owner shall have, with respect to each Operation Site, the right to drill, complete, produce and operate horizontal wells on the surface of the Operation Site[s]." SUA ¶ 3. The intended definition becomes a mystery only by ignoring

these plain terms. If the parties' original expression of intent with respect to the definition of the term were not enough, the Court could rely on extrinsic evidence. And the evidence supports the same definition. *See* Brawner Decl. at ¶ 4 ("FWP would be paid additional compensation to be calculated based on the extent of operational activity on the surface, including the wells' pad sites, water supply tanks for fracturing and completion work, compressor and similar facilities, and associated roads and pipelines.").

None of these terms presents the riddle the Chesapeake defendants suggest. The Court can identify their meaning with ease. And the Court should reject the Chesapeake defendants' feigned confusion over obvious terms in this ill-conceived attempt to avoid the payment obligation.

> **4.      The Chesapeake defendants owe $1,968,845.67 for 834,448.95 square feet of occupied land.**

The Chesapeake defendants produced an Occupied Lands Map (the "Chesapeake Occupied Lands Map") in the course of discovery.[13] The landowner plaintiffs' expert examined this map, compared it with aerial images of the leased land and Texas Railroad Commission records, and measured the extent of the Chesapeake defendants' operational footprint. Based on this work, the expert determined the Chesapeake defendants occupied 834,448.95 square feet of the Fourth Street Lands on year six of the SUA. *See* Expert Report of Tom Robertson (Sept. 11, 2015) ("Robertson Report"), at 10.[14] At $3.00 per square foot, the Chesapeake defendants owe $1,968,845.67.

**B.      The Chesapeake defendants underpaid royalty and overriding royalty payments to the landowner plaintiffs.**

> **1.      All royalty and overriding royalty payments follow the same design.**

The Fourth Street Lease and the Bunge Lease contain functionally equivalent royalty provisions. *Compare* Fourth Street Lease ¶ 3 *with* Bunge Lease ¶ 3. The parties agreed that the

---

[13] The Chesapeake Occupied Lands Map is attached as Exh. 10; App. 205.

[14] The Robertson Report is attached as Exh. 14; App. 243-276.

overriding royalties generated under the SUA would be "calculated and paid in the same manner and according to the same terms as the royalty accruing to the Lessor in the Fourth Street Lease." SUA ¶ 14.[15] And the Bunge Lease, the source for the remainder of overriding royalties, also looked to the royalty provisions to guide the overriding royalty payments. *See* Bunge Lease ¶ 25 ("The overriding royalties to be conveyed by the Lessee . . . shall be calculated and paid in the same manner and according to the same terms as the royalty accruing to the Lessor as provided in Paragraph 3 hereof."). As a result, paragraph 3 of the Fourth Street Lease and the Bunge Lease control all payments for royalties and overriding royalties.[16]

### 2.     The proceeds received by Chesapeake Marketing sets a minimum royalty.

Because the gas is not processed, the landowner plaintiffs should "receive twenty-five percent (25%) of the market value at the point of sale, use or other disposition of all such gas." Fourth Street Lease ¶ 3.B.(iii); Bunge Lease ¶ 3.B.(iii). The Chesapeake defendants assert that "production is sold at the well" under the Chesapeake gas-purchase agreement. Chesapeake Discovery Response, Response to Interrogatory No. 7. App. 186. Without more, the royalty would be based on the market value at the wellhead. But there is more.

Both leases provide that the proceeds received by Lessee sets the minimum market value: "The market value used in the calculation of all royalty under this lease shall never be less than the total proceeds received by Lessee in connection with the sale, use or other disposition of oil or gas produced or sold from the leased premises or lands pooled therewith." Fourth Street Lease ¶ 3.C.; Bunge Lease ¶ 3.C. Further, when measuring the proceeds received by the lessee, the leases call for any deductions taken from the lessee's proceeds be added back in for the calculation of royalties:

---

[15] The Master Amendment provided an immaterial amendment to this provision. *See* Master Amendment ¶ 2.B. ("The overriding royalty interests to be conveyed to FWP . . . shall be calculated and paid in the same manner and according to the same terms as the royalty accruing to the Lessor under the Lease.").

[16] All royalties and overriding royalties will be referred to as royalties unless otherwise noted.

> If Lessee realizes proceeds of production after deduction for any expenses of production, gathering, dehydration, separation, compression, transportation, treatment, processing, storage or marketing, then twenty-five percent (25%) of such deductions shall be added to the total proceeds received by Lessee for purposes of this subparagraph [i.e., paragraph 3.C.].

Fourth Street Lease ¶ 3.C.; Bunge Lease ¶ 3.C. App. 02-03; App. 082-83.

Applied to the facts in the record, this provision calls for royalty based on the WASP—the proceeds received by Chesapeake Marketing before deduction for post-production costs. As the Chesapeake defendants admit in discovery, [Chesapeake Marketing]'s contract with [Chesapeake Operating] on behalf of [Chesapeake Exploration], [Chesapeake Operating] is based on 97% of the proceeds from sales by [Chesapeake Marketing] to third parties less [Chesapeake Operating]'s share of actual post-production costs from the well to the downstream points of sale." Chesapeake Discovery Responses, Response to Request for Admission No. 9 (emphasis added); *see also* Chesapeake Discovery Responses, Response to Interrogatory No. 7 ("[Chesapeake Operating] is paid based on [Chesapeake Marketing]'s sales to third-parties less [Chesapeake Operating]'s share of the actual post-production costs to get the production from the well to the point of sale."). Indeed, the terms of the Chesapeake gas-purchase contract leaves no other interpretation because it deducts the cost of "marketing" as well as "compression, dehydration, gathering, transportation, treating [and] processing" from the WASP to arrive at the price Chesapeake Marketing pays the Lessee. Chesapeake gas-purchase contract, at 10. App. 160.

Because the "Lessee realizes proceeds of production after deduction for any expenses of . . . gathering, dehydration, separation, compression, transportation, treatment, processing, storage or marketing." Forth Street Lease, at ¶ 3.C.; Bunge Lease, at ¶ 3.C. As a result, 25% of the deductions taken under the Chesapeake gas-purchase contract get added back to the FWP's royalty to arrive at 25% of the total proceeds Chesapeake Marketing obtained before such deductions.

As a proceeds-based royalty, no deductions should apply to this measure. In *Chesapeake Exploration, L.L.C. v. Hyder*, the Texas Supreme Court affirmed a judgment against the Chesapeake defendants for underpaying royalties. No. 14-0302, slip op., at 10 (Tex. June 12, 2015). The trial court awarded the *Hyder* plaintiffs "$575,359.90 in postproduction costs that Chesapeake wrongfully deducted from their overriding royalty." *Id.*, slip op., at 4. The appellate court affirmed. *Id.* The damages figure represented the post-production costs that the Chesapeake defendants deducted from the WASP. *See id.* (referring to the WASP as "the gas sales price").

Relevant to this issue, the *Hyder* Court addressed two different royalty provisions—one a well-based market value and the other a proceeds valuation—and confirmed that a proceeds-based royalty bears no deductions:

> Two of the royalty provisions in the Hyder-Chesapeake lease are clear. The oil royalty bears postproduction costs because it is paid on the market value of the oil at the well. The market value at the well should equal the commercial market value less the processing and transporting expenses that must be paid before the gas reaches the commercial market.
>
> The gas royalty in the lease does not bear postproduction costs because it is based on the price Chesapeake actually receives for the gas through its affiliate, Marketing, after postproduction costs have been paid. <u>Often referred to as a "proceeds lease", the price-received basis for payment is sufficient in itself to excuse the lessors from bearing postproduction costs.</u> And of course, like any other royalty, the gas royalty does not share in production costs. But the royalty provision expressly adds that the gas royalty is "free and clear of all production and post-production costs and expenses," and then goes further by listing them. This addition has no effect on the meaning of the provision. It might be regarded as emphasizing the cost-free nature of the gas royalty, or as surplusage.

*Hyder*, No. 14-0302, slip op., at 5-6 (emphasis added). And the Fifth Circuit has made the same observation about the impact of a proceeds-based royalty measure: the term "'amount realized' 'require[s] measurement of the royalty based on the amount the lessee in fact receives under its sales contract for the gas' [and, under such a measure, lessor is] entitled to [the royalty share] of the sales

contract price that the lessee received, <u>with no deduction of post-production costs</u>." *Warren v. Chesapeake Exploration, L.L.C.*, 759 F.3d 413, 417 (5th Cir. 2014) (emphasis added) (quoting *Bowden v. Phillips Petroleum Co.*, 247 S.W.3d 690, 699 (Tex. 2008) and citing *Union Pac. Res. Grp. v. Hankins*, 111 S.W.3d 69, 72 (Tex. 2003)). In sum, proceeds-based royalty provisions do not bear deductions.

     **3.**      **Even if not surplusage, the Chesapeake defendants cannot take deductions because the lessee—Chesapeake Exploration—does not actually incur transportation costs.**

To the extent deductions might be taken from the proceeds-based royalty, the leases permit deductions only for the "proportionate part of all reasonable and necessary costs actually incurred by Lessee in transporting gas from the leased premises or lands pooled therewith." Fourth Street Lease, at 3.D.; Bunge Lease, at 3.D. App. 02-03; App. 082-83. The focus, then, shifts to whether or not the lessee—Chesapeake Exploration "actually incurred" any transportation costs. Because of the marketing arrangement with Chesapeake Marketing and method of payment under the Chesapeake gas-purchase contract, Chesapeake Exploration does not actually incur any postproduction costs, including transportation.

The Fifth Circuit, in *Potts II*, explained that a lessee, like Chesapeake Exploration, incurs no post-production costs in a wellhead sale: "**<u>If, as in the present case, the lessee sells the gas at the wellhead, there generally will be no post-production costs incurred by the lessee.</u>**" *Potts II*, 760 F.3d at 473-74 (emphasis added). Very recently, another court from this District concluded on the identical sale arrangement at issue here that "the record before the Court establishes <u>post-production costs are not . . . incurred by the lessee</u>." *Trinity Valley*, 2015 U.S. Dist. LEXIS 109874, at *15 (emphasis added). Because of the nature of the Chesapeake Marketing sale at the wellhead—netting all expenses out of the price paid—the law recognizes that the lessee, Chesapeake Exploration, incurs <u>no</u> post-production costs. And the summary judgment record confirms this.

### i.    All post-production expenses arise after title passes to Chesapeake Marketing at the wellhead.

Under the Chesapeake gas-purchase contract, title to the gas passes to Chesapeake Marketing at the point of delivery—the wellhead.[17] Once delivered, Chesapeake Marketing has "sole responsibility for transporting the Gas from" the wellhead to downstream markets.[18] In Texas, the wellhead represents the first place post-production expenses can occur. *See Exxon Corp. v. Middleton*, 613 S.W.2d 240, 244 (Tex. 1981) ("Production means actual physical extraction of the mineral from the land."); *Blackmon v. XTO Energy, Inc.*, 276 S.W.3d 600, 604 (Tex. App.—Waco 2008, no pet.) ("Historically, 'production' ceases once the lessee extracts oil or gas from the ground at the wellhead."). And, since Chesapeake Marketing takes title and responsibility for the gas at the wellhead, only Chesapeake Marketing stands in a position to incur post-production expenses, whether transportation or otherwise.

The Chesapeake defendants have produced no contracts for any post-production activity between Chesapeake Exploration and any postproduction service provider. And every invoice and statement reflects charges actually incurred by Chesapeake Marketing, not Chesapeake Exploration. All discovery responses reflect this reality: "[Chesapeake Marketing] contracts for gathering, treating, processing, and transportation services and deducts or subtracts [Chesapeake Operating]'s share of these postproduction costs from proceeds paid [to Chesapeake Operating]." Chesapeake Discovery Response, Response to Interrogatory No. 7 App. 186. No documents suggests that Chesapeake Exploration—the lessee—"actually incurs" any post-production expenses, let alone transportation.

---

[17] Chesapeake gas-purchase contract ¶ 8.1, Ex. 6, at App. 156. ("Unless otherwise specifically agreed, title to the Gas shall pass from Seller to Buyer at the Delivery Point. . . . Buyer shall have responsibility for and liability with respect to said Gas after its delivery to Buyer at the Delivery Point."). *See also* Chesapeake Discovery Response, Response to Interrogatory No. 7 (providing that "production is sold at the well by [Chesapeake Operating], on behalf of [Chesapeake Exploration], to [Chesapeake marketing]." App. 186.

[18] Chesapeake gas-purchase contract ¶ 4.1, Ex. 6, at App. 154.

ii.     **The Chesapeake defendants have argued that Chesapeake Marketing, not Chesapeake Exploration, incurs all post-production costs.**

In *Potts I*, the Chesapeake defendants told the trial court that Chesapeake Exploration—the lessee—does <u>not</u> incur any post-production expenses in an identical wellhead sale arrangement:

> Not only is the "point of sale" pivotal, it is the key inquiry for the Court, as "the point of sale" is . . . the location at which title to the natural gas passes; and . . . **the point at which no further post-production costs and expenses are incurred by CELLC**. The undisputed evidence before the Court is that the "point of sale" is at the wellhead [and] title passes to CELLC's purchaser at the wellhead . . . .

Chesapeake's Resp. to Plaintiffs' Post-Submission Letter Brief ("Chesapeake Letter Brief"), *Potts I*, No. 3:12-cv-1596 (doc. 35) at 3, Ex. 2, at App. 223. (emphasis added).[19]

Following the Chesapeake defendants' argument, the district court entered summary judgment in favor of the Chesapeake defendants. *See generally Potts I*, No. 3:12-cv-1596, 2013 U.S. Dist. LEXIS 33264, at *24.[20] The Chesapeake defendants advanced the same arguments on appeal. Affirming the district court, the Fifth Circuit confirmed that the lessee, Chesapeake Exploration, incurs no post-production costs in a wellhead sale: "**If, as in the present case, the lessee sells the gas at the wellhead, there generally will be no post-production costs incurred by the lessee**." *Potts II*, 760 F.3d at 473-74 (emphasis added); *see also id.* at 474 ("As discussed above, when gas is sold at the wellhead, there are typically no costs of compression, dehydration, treatment or transportation."). And, in *Potts II*, the Fifth Circuit made clear that Chesapeake Marketing—not Chesapeake Exploration—incurs the post-production expenses: "[Chesapeake Marketing] pays Chesapeake the weighted average sales price that [Chesapeake Marketing] receives when it sells the gas downstream, after deducting <u>post-production costs that CEMI incurs</u> between the wellhead and the points at which deliveries to unaffiliated purchasers occur." *Potts II*, 760 F.3d at 472.

---

[19] The Chesapeake Letter Brief is attached as Exh. 12, App. 221-231.

[20] The *Potts I* summary judgment order is attached as Exh. 13, App. 232-42.

For the purpose of interpreting the Fourth Street Lease and the Bunge Lease, the summary judgment record demonstrates that Chesapeake Marketing, <u>not Chesapeake Exploration</u>, actually incurs all post-production expenses. Texas law, the summary judgment record, and the Chesapeake defendants' own arguments, all establish that costs of transporting gas were not "actually incurred by" Chesapeake Exploration. Even if proceeds-based royalty permitted deductions, they would not qualify on these facts.

**4.    The Chesapeake defendants owe the landowner plaintiffs $901,342.27 through May 2015 production, with interest through August 31, 2015.**

    **i.    Single damages measure $450,671.14 through May 2015 for royalty and overriding royalty underpayments.**

Jane Kidd, of Alvarez & Marsal, has quantified the amount of underpayments using the Chesapeake defendants' documents. Ms. Kidd's calculations show that the Chesapeake defendants have underpaid plaintiffs by $390,968.40, before interest, from February 2010 to May 2015. *See* Expert Report of Jane Kidd ("Kidd Report") (September 11, 2015), at Table 1-B, Ex. 11, at App. 218. Applying simple interest of 6% per annum, the amount becomes $450,671.14 in underpayments and interest. *See* Kidd Report, at Table 1-B, Ex. 11, at App. 218.

    **ii.    The leases provide for double damages for wrongful deductions.**

Both leases provide that the Chesapeake defendants must pay the landowner plaintiffs double the amount deducted contrary to the leases' terms:

> In the event Lessee (or a purchaser contracted by Lessee to purchase production from the leased premises) fails to comply with the terms of this sub-paragraph and does deduct costs or expenses from Lessor's royalty (or otherwise reduce Lessor's royalty for such costs and expenses), Lessee shall reimburse Lessor as follows:
>
> > (i)    double the amount of such deductions made from the date first deducted, plus
>
> > (ii)    interest on such amount at an annual percentage rate equal to the prime rate of interest as set by Texas Capital Bank as of the royalty due date, plus six percent (6%) or the

maximum contract rate allowed by law, whichever is lesser, such interest to be compounded monthly.

Fourth Street Lease ¶ 3(D); Bunge Lease ¶ 3(D) App. 02-03; App. 082-83. Ms. Kidd has calculated that the sum of double the amount of deductions from February 2010 through May 2015, with interest added through August 31, 2015, is $901,342.27. Kidd Report, Table 1-B, Ex. 11, at App. 218.

## V.     CONCLUSION

The Court should grant partial summary judgment to the landowner plaintiffs for the reasons stated above. The Chesapeake defendants have failed to honor their obligations under the relevant agreements. And, as to the issues detailed in this motion, no issue of fact exists—both as to liability and damages—and the landowner plaintiffs are entitled to judgment as a matter of law.

Dated: September 11, 2015.

Respectfully submitted,

Daniel H. Charest
State Bar No. 24057803
Warren T. Burns
State Bar No. 24053119
Will Thompson
State Bar No. 24094981
BURNS CHAREST LLP
500 North Akard Street, Suite 2810
Dallas, Texas 75201
Telephone: (469) 904-4550
Facsimile: (469) 444-5002
dcharest@burnscharest.com
wburns@burnscharest.com
wthompson@burnscharest.com

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been served on this day, September 11, 2015, via the Court's ECF system as indicated below:

Greg W. Curry
Rachelle H. Glazer
Craig A. Haynes
THOMPSON & KNIGHT LLP
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
greg.curry@tklaw.com
rachelle.glazer@tklaw.com
craig.haynes@tklaw.com

Jennifer P. Henry
THOMPSON & KNIGHT LLP
801 Cherry Street, Unit # 1
Burnett Plaza, Suite 1600
Fort Worth, Texas 76102
jennifer.henry@tklaw.com

_____
Daniel H. Charest