IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| FORT WORTH 4TH STREET PARTNERS, L.P., MOJITO ENERGY LLC, KSM MINERALS, LLC, 4TH STREET MINERALS, LLC, and REILLY FAMILY MINERALS, LLC, | § § § § § § | |
| Plaintiffs, | § § | |
| vs. | § § | No.  3:14-cv-03871 |
| CHESAPEAKE ENERGY CORP., CHESAPEAKE OPERATING, LLC, CHESAPEAKE EXPLORATION, LLC as Successor by Merger to Chesapeake Exploration, LP, and CHESAPEAKE LAND COMPANY, LLC, | § § § § § § § | |
| Defendants. | § § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Plaintiffs' and Defendants' Motions for Partial Summary

Judgment.  The parties notified the Court that they reached an agreement to settle all claims,

with the exception of Plaintiffs' Claim 12 ("the Occupied Lands Claim") [ECF No. 34].  The

parties therefore ask the Court to address only the Occupied Lands Claim.  Having

considered the relevant arguments and evidence, the Court **DENIES** the Plaintiffs' Motion

for Summary Judgment [ECF No. 27] and **GRANTS** the Defendants' Motion for Summary

Judgment [ECF No. 24] as to the Occupied Lands Claim.

## I.    BACKGROUND

In 2005, Fort Worth 4th Street Partners, L.P. ("FWP"), a limited partnership which

owned the FWP Lands, entered into a Surface Use Agreement (the "SUA") with Dale

Resources, LLC.  The SUA, which identifies Dale Resources as the "Working Interest

Owner," and FWP as the "Surface Owner," governs operations on the FWP Lands that were

subject to a mineral lease between FWP and Dale Resources ("the Lease").  FWP originally

intended to develop the surface of the FWP Lands for residential use,[1] so the SUA included a

number of restrictions on the Working Interest Owner's use of the surface.  The SUA, in

Paragraph 17, also provided for a payment to the Surface Owner for use of the surface of the

FWP Lands, to be calculated based on the amount of surface area used:

> On or before the expiration of six (6) years from the date of this
> Surface Use Agreement (the "Damage Payment Date"), the
> Working Interest Owner shall pay to the Surface Owner a sum
> equal to Six Dollars ($6.00) per square foot (the "Base Price")
> for each square foot included in an Operation Site, the Central
> Facility, the Water Supply Pit and all roads and pipeline
> easements appurtenant to any of the same (collectively the
> "Occupied Lands"); provided, however, if, before the Damage
> Payment Date, Working Interest Owner has drilled and
> completed at least eight (8) wells on and from an Operation Site,
> then the "Base Price" shall be reduced from Six Dollars and
> No/100 ($6.00) per foot to Three Dollars and No/100 ($3.00)
> per foot. . . .[2]

The parties agree that the $3 per square foot figure would now be in effect pursuant to

Paragraph 17.  The Lease separately provided that the Lessee would pay "Lessor (or the

owner of the surface of the leased premises)" for all damages and losses to the FWP Lands

caused by the Lessee's operations, and designated amounts for the construction or

installation of roads, pipelines, tanks, and other projects, prior to construction of each facility

on the FWP Lands.[3]

The parties agreed, in the SUA, as follows:

> The terms, provisions and conditions hereof shall be covenants
> running with [the] land and shall be binding upon and inure to

---

[1] Pl. Br. [ECF No. 28], Ex. 2, Decl. of Jeffrey Brawner at ¶ 4.
[2] Pl. Appx. [ECF No. 29], Ex. 2, SUA at ¶ 17.
[3] Pl. Appx. [ECF No. 29], Ex. 1, Lease at ¶ 21.

the benefit of the Working Interest Owner, and the Surface
Owner, and each of their respective successors, legal
representatives, heirs, assigns, lessees, and sublessees.[4]

In 2006, Chesapeake Exploration, L.P. acquired Dale Resources' interests, rights, and
obligations in the SUA and the Lease.[5]  Chesapeake Exploration, LLC succeeded by merger
to Chesapeake Exploration, L.P.'s rights.[6]  Then, in 2007, Chesapeake Land Company, LLC
acquired the surface of the FWP Lands from FWP, for approximately $32,000,000,[7] with
FWP reserving the mineral interests under the FWP Lands.[8]  FWP and its designees—
Plaintiffs Mojito Energy, LLC, KSM Minerals, LLC, 4th Street Minerals, LLC, and Reilly
Family Minerals, LLC—executed a Master Amendment to the Lease and the SUA with
Defendants Chesapeake Energy Corporation, Chesapeake Land Company, LLC, and
Chesapeake Exploration, LLC.[9]

The Master Amendment removed "any provision of the [SUA] which purports to
limit or restrict the 'Working Interest Owner's' right to enter upon or use any portion of the
surface of the FWP Lands. . . including, but not limited to Paragraphs 1 through 13" of the
SUA.[10]  The Master Amendment states that "all terms and provisions of the . . . Surface
Agreement . . . are hereby amended and modified wherever necessary, and even though not
specifically addressed herein, so as to conform to the amendments set forth in this

---

[4] Pl. Appx. [ECF No. 29], Ex. 2, SUA at ¶ 22.
[5] The Master Amendment states that "Chesapeake Exploration Limited Partnership . . . succeeded to the interest of
Dale . . . in and to . . . the [SUA]."  Pl. Appx. [ECF No. 29], Ex. 5, Master Amendment at 2.
[6] *Id.* (stating that Chesapeake Exploration, LLC "succeeded to all the interests, rights, and obligations" of
Chesapeake Exploration, L.P. under the SUA).
[7] Pl. Appx. [ECF No. 29], Ex. 3, Real Estate Purchase Agreement.
[8] Pl. Appx. [ECF No. 29], Ex. 3, Real Estate Purchase Agreement.
[9] The Defendants are related entities involved in the oil and gas business.  Chesapeake Exploration, LLC has
succeeded to Dale Resources' interests, rights, and obligations under the SUA, and the obligation at issue in Claim
12 arises from the SUA.  Under the Occupied Lands Claim, therefore, Plaintiffs seek only to have Defendant
Chesapeake Exploration, LLC make the payment contemplated in Paragraph 17 of the SUA.
[10] Pl. Appx. [ECF No. 29], Ex. 5, Master Amendment at ¶ 2(A).

Amendment."[11]   Additionally, the Master Amendment eliminated the surface damages

provisions in the Lease.[12]   The Master Amendment made clear, however, that "[e]xcept as

otherwise amended hereby, any and all terms and provision[s] of the . . . Surface Agreement .

. . shall remain in full force and effect."[13]   It further contained a "non-merger" provision

clarifying that, "the terms and provisions of the . . . the Surface Agreement . . . as amended

hereby, shall remain in full force and effect notwithstanding the fact that [Chesapeake Land

Company, LLC] has acquired fee simple title to the surface" of the FWP Lands."[14]

The Master Amendment reiterated that:

> The terms, provisions, covenants and conditions of the . . .
> Surface Agreement, . . . and this Amendment, . . . are, and are
> intended to be, and shall be deemed to be covenants running
> with the FWP Lands. . . .[15]

The date for payment under Paragraph 17 of the SUA has passed, and Chesapeake

Exploration, LLC did not make payment to the Plaintiffs thereunder.  In the Occupied Lands

Claim, Plaintiffs allege that Chesapeake Exploration, LLC thus breached its obligation under

Paragraph 17.  Based on the calculations of Plaintiffs' expert, Chesapeake Exploration, LLC

owes Plaintiffs $2,503,346.85 under Paragraph 17.[16]  Defendants do not disagree with that

calculation.[17] The question presented here is whether Plaintiffs' sale of the surface to

Chesapeake Land Company, LLC and/or execution of the Master Amendment eliminated

Chesapeake Exploration, LLC's obligation to make payment to Plaintiffs under Paragraph 17

---

[11] Pl. Appx. [ECF No. 29], Ex. 5, Master Amendment at ¶ 4.H.
[12] Pl. Appx. [ECF No. 29], Ex. 5, Master Amendment at ¶ 1.B.
[13] Pl. Appx. [ECF No. 29], Ex. 5, Master Amendment at ¶ 4.H.
[14] Pl. Appx. [ECF No. 29], Ex. 5, Master Amendment at ¶ 4.I.
[15] Pl. Appx. [ECF No. 29], Ex. 5, Master Amendment at ¶ 4.A.
[16] Pl. Unopposed Mot. To Correct Damages Associated With the Occupied Lands Claim [ECF No. 46].
[17] *Id.*; *see also* Def. Resp. to Pl. Unopposed Mot. To Correct Damages Associated With the Occupied Lands Claim [ECF No. 47].

of the SUA.  If so, Plaintiffs' Occupied Lands Claim fails as a matter of law.  If not,

Chesapeake Exploration, LLC is required by law to make the payment.

## II.       LEGAL STANDARD

Summary judgment is proper when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A

party seeking summary judgment bears the initial burden of showing the absence of a

genuine issue for trial.  *See Duffy v. Leading Edge Prods.*, *Inc.*, 44 F.3d 308, 312 (5th Cir.

1995).  The movant can satisfy that burden by showing there is an absence of evidence to

support the nonmoving party's case on which that party would have the burden of proof at

trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the movant meets its initial

burden, the non-movant must show that summary judgment is not proper.  *See Duckett v.

City of Cedar Park*, 950 F.2d 272, 276 (5th Cir. 1992).  On cross-motions for summary

judgment, the Court reviews each party's motion independently, viewing the evidence and

inferences in the light most favorable to the nonmoving party. *See Ford Motor Co. v. Tex.

Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001).

## III.      THE OCCUPIED LANDS CLAIM

Plaintiffs claim that the plain terms of the SUA and the Master Amendment establish

that Defendants owe them $2,503,346.85 as a matter of law: Paragraph 17 requires the

Working Interest Owner to pay the Surface Owner six years after the effective date of the

SUA; the Master Amendment states, and the parties agree, that Chesapeake Exploration,

LLC succeeded to the interest of the Working Interest Owner in the SUA; therefore,

Plaintiffs argue that Chesapeake Exploration, LLC owes them the amount due under

Paragraph 17.

Defendants argue that Plaintiffs cannot prove a breach of Paragraph 17 because: 1) the benefit of the payment for surface use runs with the surface estate, and thus, when Plaintiffs conveyed the surface of the FWP Lands to Chesapeake Land Company, LLC, they lost the right to receive the payment; and 2) the Master Amendment eliminated material terms necessary to enforce any right to the payment under Paragraph 17 of the SUA.[18]

### A. Plaintiffs Lost the Right to Receive Payment Upon Sale of the Surface

Defendants argue that the right to payment under Paragraph 17 is a benefit of a covenant that runs with the surface estate. Plaintiffs argue FWP retains the right to receive the payment as an original party to the SUA. Plaintiffs urge that the "running with the lands doctrine" is intended to allow beneficiaries under a contract to "enforce a promise against a successive owner who is not a party to the original contract," and, because FWP was a party to the contract, "the notion of binding unknown successors in interest under the doctrine simply does not apply" and Plaintiffs are entitled to enforce the covenant. Pl. Br. [ECF No. 40], at 9–10.

The Court finds Plaintiffs' argument unpersuasive. As Plaintiffs recognize, "when the covenant runs with the land, the promisor's successors in title are bound to perform the promise *and* the promisee's successors in title are able to enforce the promise." Pl. Br. [ECF No. 40] at 9 (quoting R. Powell, Powell on Real Property § 60.04) (emphasis added); *see also Fallis v. River Mountain Ranch Prop. Owners Ass'n, Inc.*, 2010 WL 2679997, at *9 (Tex. App.—San Antonio 2010, reh'g overruled) (stating that a covenant running with the

---

[18] Plaintiffs claim these two arguments are inconsistent. Under the first argument, Defendants claim the duty to pay under Paragraph 17 survived transfer of the property, but, under the second argument, Defendants claim the Master Amendment eliminated any duty to pay under Paragraph 17. The Court does not find the arguments inconsistent— as the Court concludes, Plaintiffs lost the right to receive the payment when they conveyed the property *and* the Master Amendment ultimately made the duty to pay and the benefit therefrom unenforceable by any party.

land "may be enforced by a successor-in-interest").  It follows that "a real covenant can *only* be enforced by the owners of the land the covenant was intended to benefit." *First Permian, L.L.C. v. Graham*, 212 S.W.3d 368, 372 (Tex. App.–Amarillo 2006, pet. denied) (emphasis added); *Davis v. Skipper*, 83 S.W.2d 318, 322 (Tex. 1935) ("[If] this be regarded as a covenant intended for the benefit of . . . lands which were owned by the grantor at the time, it cannot be enforced . . . in the absence of proof that plaintiffs still retained lands for which the covenant was created to benefit.").  Because Plaintiffs do "not have a current interest in the estate" with which the right to payment allegedly runs, if the right runs with the land, it is not enforceable by Plaintiffs.  *First Permian, L.L.C.*, 212 S.W.3d at 373.

The Court therefore must consider whether the right to payment under Paragraph 17 runs with the land.  Under Texas law, a covenant runs with the land when it "[1] touches and concerns the land; [2] relates to a thing in existence or specifically binds the parties and their assigns; [3] is intended by the original parties to run with the land; and [4] when the successor to the burden has notice."  *In re Energytec, Inc*., 739 F.3d 215, 221 (5th Cir. 2013) (quoting *Inwood N. Homeowners' Ass'n, Inc. v. Harris,* 736 S.W.2d 632, 635 (Tex. 1987)).  There must also be privity between the parties.  *Id.*  A covenant running with the land "accompanies a conveyance of the land, and passes from one purchaser to another, through each successive link in the chain of title."  *Mobil Oil Corp. v. Brennan*, 385 F.2d 951, 953 (5th Cir. 1967) (quoting *Flanniken v. Neal*, 4 S.W. 212 (Tex. 1887).

The Court concludes that the right to receive a payment under Paragraph 17 is a right that runs with the surface estate.[19]  First, the covenant touches and concerns the surface

---

[19] The payment runs with the surface estate, not the mineral estate.  A reservation of mineral rights by the fee owner when conveying the surface estate "effects a horizontal severance and the creation of two separate and distinct estates: an estate in the surface and an estate in the minerals."  *Reed v. Wylie*, 597 S.W.2d 743, 751 (Tex. 1980).

7

estate.  A covenant must affect the owner's interest in the property or its use in order to run with the land.  *In re Energytec, Inc*., 739 F.3d at 224.  Neither party has cited a case involving facts precisely like those here, but the Fifth Circuit has held: 1) that covenants restricting use of the surface touch and concern the surface estate, *see Mobil Oil Corp.*, 385 F.2d at 953; and 2) that a right to a fee for use of real property touches and concerns that property. *In re Energytec, Inc*., 739 F.3d at 224.

In *In re Energytec, Inc*., under the terms of the agreement, a company had a right to receive a transportation fee based on the amount of gas flowing through a pipeline.  *Id.*  The court found the obligation touched and concerned the land because the fee was "for the use of real property." *Id.*  The court distinguished *In re El Paso Refinery, LP*, which held that a covenant preventing subsequent owners of an oil refinery from seeking environmental remediation from the refinery's original owner did not touch and concern the land, because the covenant had "no direct impact upon the land itself."  302 F.3d 343, 356-57 (5th Cir. 2002).  Subsequent owners could "take remedial action or not take remedial action, pollute or not pollute, as long as contribution [wa]s not sought from" the original owner.  *Id.* at 356-57. The transportation fee covenant in *In re Energytec, Inc*., in contrast to the environmental remediation covenant in *In re El Paso Refinery, LP*, directly related to use of real property.

Here, Defendants have established that the right to payment touches and concerns the land.  According to Paragraph 17, the payment is to be calculated based on the surface area actually used and thus "impact[s] the owner's interest" in the land and "the [land's] value in the eyes of prospective buyers."  *In re Energytec, Inc*., 739 F.3d at 224.  Plaintiffs themselves

---

Here, the surface benefits from the payment, and the covenant thus runs with the surface estate.

have recognized that the payment relates to use of the surface, characterizing the payment as "the surface use payment obligation."  Pl. Br. [ECF No. 28], at 13; *see also* Pl. Br. [ECF No. 44] at 5 (stating that the payment obligation was "exclusively the result of FWP's ownership of the surface").  Like the transportation fee in *In re Energytec, Inc.*, the surface use payment is "for the use of real property" and thus touches and concerns the surface estate.  *Id.* at 224.

Second, the right to payment under Paragraph 17 relates to a thing in existence—the surface of the FWP Lands, and the express language of the SUA binds the parties' successors and assigns.[20]  Thus, the second element for a covenant to run with the land is met.

A third relevant factor is that the parties intended the payment right to run with the surface estate.  "In order for a covenant to run with the land, the parties who created the covenant must intend for it to do so."  *MPH Prod. Co. v. Smith*, 2012 WL 1813467, at *3 (Tex. App.—Texarkana 2012, no pet.).  When a contract is unambiguous, courts ascertain the intent of the parties from language in the contract.  *Luckel v. White,* 819 S.W.2d 459, 461 (Tex. 1991).  The language of the SUA and the nature of the right make clear that the parties intended the right to receive a payment under Paragraph 17 to be a covenant that runs with the land.  Regardless of whether Plaintiffs expected to receive the payment under the SUA at the time it was executed, both parties in the SUA "stated an intent" that the covenants in the agreement would run with the land, and the Master Amendment confirmed that intent. *In re Energytec, Inc.*, 739 F.3d at 221; *Int'l Real Estate Holding Co., LLC v. For 1013 Regents, LLC*, 2013 WL 1091243, at *6 (N.D. Tex. Mar. 13, 2013) (Lynn, J.) ("Where there is no ambiguity, the intent of the parties is best evidenced by the language of the contract itself.").

The fourth pertinent matter is that the Plaintiffs and Chesapeake Exploration, LLC

---

[20] Pl. Appx. [ECF No. 29], Ex. 2, SUA at ¶ 22.

had notice of the covenant.  Texas law only requires that successors to the *burdened* estate

have notice of a covenant that runs with the land, and Chesapeake Exploration, LLC does not

contest that it had notice of the covenant.  *See In re Energytec, Inc*., 739 F.3d at 221.  Even if

the party transferring a benefitted estate were required to have notice, Plaintiff FWP was put

on notice of the covenant when it signed the SUA, and all Plaintiffs were put on notice when

they signed the Master Amendment—an   agreement that recognized the SUA and stated that

the SUA's provisions were intended to run with the land.[21]

Finally, the privity of estate requirement for the covenant to run with the land is

established.  Vertical privity is required to enforce a covenant, and is satisfied through

succession of ownership of the burdened or benefitted property.  *See In re Energytec, Inc.*,

739 F.3d at 22.  Plaintiffs do not dispute that FWP conveyed the surface of the FWP Lands to

Chesapeake Land Company, LLC, such that rights appurtenant to the FWP surface passed to

Chesapeake Land Company, LLC.  Horizontal privity is met where there was "a mutual or

successive relationship to the same rights of property" when the covenant was created.

*Westland v. Golf Oil Corp.*, 637 S.W.2d 903, 910-11 (Tex. 1982).  "[T]his requirement is

satisfied by either simultaneous or successive interests in the same land."  *Wayne Harwell*

*Props., Inc. v. Pan Am. Logistics Ctr., Inc.*, 945 S.W.2d 216, 218 (Tex. App.—San Antonio

1997, writ denied).  Neither party has addressed horizontal privity, but it is uncontested that,

at the time the SUA was executed, both FWP and Dale Resources held an interest in the

FWP Lands, and the covenant was "created at the time of a conveyance in real property."  *In*

*re Energytec, Inc.*, 739 F.3d at 223.  Thus, to the extent that horizontal privity is required

---

[21] Pl. Appx. [ECF No. 29], Ex. 5, Master Amendment at ¶ 4.A.

under Texas law,[22] it is present here.

The remaining question is whether the Master Amendment severed the covenant from the land, turning it into a personal right.  Plaintiffs claim the non-merger provision of the Master Amendment prevented transfer of the payment benefit to Chesapeake Land Company, LLC by stating that "the terms and provisions of [the SUA] as amended hereby, shall remain in full force and effect notwithstanding the fact that [Chesapeake Land Company] has acquired fee simple title to the surface of the FWP Lands."[23]  Further, although the Master Amendment explicitly removes restrictions on the Working Interest Owner's *use* of the surface, Plaintiffs maintain it does not address Paragraph 17's obligation to *pay* for such use, and, because the parties did not eliminate Paragraph 17, as they did Paragraphs 1 through 13, they intended for FWP to receive the payment despite conveyance of the surface estate.[24]

A covenant that runs with the surface estate "remain[s] forever with the surface estate in the absence of certain circumstances, [including] express detachment or abrogation" of the covenant by the surface owner.  *Manges v. Gulf Oil Corp.*, 394 F.2d 487, 488 (5th Cir. 1968).  An example of abrogation was in *Manges*, where an owner of both the surface and mineral estates entered into an oil and gas lease which reserved for the owner the right to require the lessee to bury pipelines.  *Manges*, 394 F.2d at 488–89.  The owner then conveyed

---

[22] *See In re Energytec, Inc.*, 739 F.3d at 222–23 (finding it unclear whether Texas law requires horizontal privity and noting that the doctrine is "much criticized' and "has been explicitly rejected by th[e] latest Restatement").

[23] Pl. Appx. [ECF No. 29], Ex. 5, Master Amendment at ¶ 4.I.

[24] Additionally, Plaintiffs claim that Defendants have treated FWP as the "Surface Owner" under the SUA, even after FWP sold the surface of the FWP Lands, by making royalty payments to FWP.  *See* SUA ¶ 14; Brawner Decl., at ¶ 7.  Defendants respond that, under Texas law, an interest in royalty payments runs with the mineral estate, not the surface estate, and Plaintiffs have retained the mineral estate.  *Altman v. Blake*, 712 S.W.2d 117, 118 (Tex. 1986) (stating that the right to receive royalty payments is an "essential attribute" of a severed mineral estate). Additionally, the Master Amendment specifically amends the SUA's royalty payment obligation to the Plaintiffs. Master Amendment at ¶ 2.B.  In any case, the royalty payment obligation is not before the Court, and Defendants' payment of royalty fees to Plaintiffs is not dispositive of the matter at issue here.

the mineral estate, along with "all other rights, titles, interests, properties and estates reserved to [him] under" the lease. *Id.* When the owner subsequently conveyed the surface estate, the new surface owner was not entitled to enforce the pipe burial covenant, because that covenant was among the rights reserved to the owner under the oil and gas lease and then abrogated by the later agreement conveying the mineral estate along with all "other rights, titles, interests, properties, and estates" that had been reserved to the owner. *Id.*; *see also Carrigan v. Exxon Co. U.S.A.*, 877 F.2d 1237, 1243 (5th Cir. 1989) (the surface owner entered into a broad grant of surface rights to a lessee, which was held to abrogate the surface owner's right to require pipeline burial). The *Manges* court held that the conveyance of the mineral estate expressly detached the pipe burial covenant from the surface before the surface estate was conveyed to the new surface owner.  For that reason, the right to enforce the pipe burial covenant never passed to the new surface owner. Stated differently, the court held that the prior conveyance of the mineral estate by the owner of both the surface and the minerals, together with all the rights reserved to the lessor under the oil and gas lease to which the mineral estate may be subject, operated to detach the covenant that ran with the land from the surface estate and deprive the surface estate owner and his grantees of the right to enforce that covenant. *Manges*, 394 F.2d at 488–89.

Here, although the Master Amendment does not specify that Paragraph 17 continues in effect, it does not expressly detach the payment obligation from the surface, either by reserving it for FWP or conveying it to someone else.  Instead, the Master Amendment reiterates that *all* of the SUA's covenants run with the land, and the contract conveying the surface states that the land is conveyed together with "all rights, privileges, easements,

benefits, and agreements appurtenant thereto."[25]  By stating, that except as altered by the

Master Amendment, and despite the sale of the surface, the SUA "remain[s] in full force and

effect," the Master Amendment does not convert the SUA's covenants into personal

covenants *sub silentio*; rather, it confirms that the SUA's covenants run with the land.

      When interpreting a contract, courts consider the entire writing and attempt to

harmonize and give effect to the whole document.  *Frost Nat'l Bank v. L & F Distribs., Ltd.,*

165 S.W.3d 310, 311–12 (Tex. 2005).  Plaintiffs' interpretation of the SUA, as amended by

the Master Amendment, does not give effect to the document as a whole.  Prior to the Master

Amendment, the SUA restricted the number and size of "Operation Sites" and related surface

structures.[26]  Payment under Paragraph 17 was to be calculated based on that limited use, but

the Master Amendment removed all such restrictions.  Without a provision stating that

Defendants were obligated to pay Plaintiffs, despite the fact that Plaintiffs no longer owned

the surface, "it is a stretch to read into the subtleties of the [Master Amendment's] text an

intent to make the right [to receive the surface use payment] a personal right only."  *MPH*

*Prod. Co.*, 2012 WL 1813467, at *6.  Thus, the right to receive payment under Paragraph 17

runs with the surface, and the Master Amendment did not sever the right from the land.

      The non-merger provision of the Master Amendment did not alter the nature of the

right to receive a payment under Paragraph 17 of the SUA.  That right existed, at the time the

Master Amendment was signed, as a covenant running with the surface estate.  When

Defendants acquired the surface estate, they also acquired the covenants running with the

surface estate.  Therefore, as a matter of law, Plaintiffs are not entitled to receive the

---

[25] Pl. Appx. [ECF No. 29], Ex. 3, Real Estate Purchase Agreement, App. 48.
[26] Pl. Appx. [ECF No. 29], Ex. 2, SUA at ¶ 3.

payment.

### B. The Master Amendment Eliminated Essential Terms for Enforcing the Payment

In the alternative, even if Plaintiffs had not lost the right to receive payment under Paragraph 17, the provision is no longer enforceable, because the Master Amendment eliminated terms that are necessary to determining what payment would be owed under Paragraph 17.  It requires the Working Interest Owner to pay for "each square foot included in an Operation Site, the Central Facility, the Water Supply Pit and all roads and pipeline easements appurtenant to any of the same (collectively the 'Occupied Lands')."  The SUA defined "Operation Site,"[27] "Central Facility,"[28] and "Water Supply Tank."[29]  However, in deleting Paragraphs 1 through 13 of the SUA, the Master Amendment eliminated the definition for "Operation Site."  Further, the Master Amendment removed "any provision of the [SUA] which purports to limit or restrict the 'Working Interest Owner's right to enter upon or use any portion of the surface of the FWP Lands," and the definitions of "Central Facility" and "Water Supply Tank," found in Paragraph 16 of the SUA had limited surface use.  Defendants argue that the term "Occupied Lands" in Paragraph 17, which references these terms, is therefore indefinite, and the surface use payment obligation is thus now unenforceable.

Plaintiffs maintain that the Master Amendment did not eliminate the definitions of "Central Facility" and "Water Supply Tank," because the Master Amendment did not expressly delete Paragraph 16 of the SUA, where they appear, and only portions of

---

[27] Pl. Appx. [ECF No. 29], Ex. 2, SUA at ¶ 3
[28] Pl. Appx. [ECF No. 29], Ex. 2, SUA at ¶  16(a)
[29] Pl. Appx. [ECF No. 29], Ex. 2, SUA at ¶ 16(b). The SUA does not define "Water Supply Pit," but the parties appear to agree that the undefined term "Water Supply Pit" and the defined term "Water Supply Tank," are interchangeable.

Paragraph 16 limit surface use, such that when those limitations are removed, "Occupied

Lands" remains reasonably definite, particularly because a "Site Plan" attached to the SUA

specifies the locations the parties planned for the facilities to occupy.  The Court disagrees.

Paragraph 16 significantly limits use of the surface.  *See* SUA ¶ 16(a) (defining a "Central

Facility" as "an approximately 1.0 acre site" which "shall be used . . . for the sole purpose of

constructing, maintaining, and operating a natural gas facility for the separating, treating,

dehydrating and compression of gas," and requiring that it be surrounded by a fence and

maintained to "optimize the visual and esthetic appeal" of the surface); ¶ 16(b) (defining

"Water Supply Tank" as "approximately one and one-half (1.5) acre" "for use in connection

with drilling and completion operation on wells" which must be surrounded by a fence).

These provisions are inconsistent with the Master Amendment, which removed *all*

limitations on surface use, and amended "all terms and provisions of the . . . Surface

Agreement . . . wherever necessary, and even though not specifically addressed herein, so as

to conform to the amendments set forth."[30]  To the extent that the "Site Plan" attached to the

SUA limited the manner in which the surface could be used, the Master Amendment

similarly removed such restrictions.  The Court thus concludes that three terms used to

determine the payment under Paragraph 17 were removed.

  Without definitions for these terms, the payment obligation under Paragraph 17 is

indefinite and unenforceable.  To be enforceable, a contract "must define its essential terms

with sufficient detail to allow a court to determine the obligations of the parties."  *Sadeghi v.*

*Gang*, 270 S.W.3d 773, 776 (Tex. App.—Dallas 2008, no pet.); *Chavez v. McNeely*, 287

S.W.3d 840, 845 (Tex. App.—Houston 2009, no pet.).  Contract terms are reasonably certain

---

[30] Pl. Appx. [ECF No. 29], Ex. 5, Master Amendment at ¶ 4.H.

"if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." *Chavez*, 287 S.W.3d at 845 (quoting Restatement (Second) of Contracts § 33(2) (1981)). If a contract "is not clear and certain as to all essential terms, it will fail for indefiniteness." *Sadeghi*, 270 S.W.3d at 776. Whether an agreement fails for indefiniteness is a question of law for the court. *Id.*; *RLI Ins. Co.*, 2007 WL 2428599, at *3.

The law favors finding agreements sufficiently definite for enforcement, particularly where a party has already provided the services for which compensation is to be paid. *Am.'s Favorite Chicken Co. v. Samaras*, 929 S.W.2d 617, 623 (Tex. App.—San Antonio 1996, writ denied). A trial court should "consider the contractual language in light of the experience of the parties and their familiarity with the meaning of technical terms used in the business or industry" and is permitted to construe words and terms in an agreement as such terms are "usually understood by persons in the profession, business or industry." *Id.* at 622–23. However, a court does not possess "authority to interpolate essential elements in order to uphold the contract." *Marx v. FDP, LP*, 2015 WL 4932655, at *6 (Tex. App.—San Antonio 2015, pet. denied).

Plaintiffs argue that even if all three terms were deleted from the SUA, the Court can still determine the parties' intent either by looking to the original definitions in the SUA or considering commonly understood meanings in the oil and gas industry. *See Oakrock Exploration Co. v. Killam*, 87 S.W.3d 685, 690 (Tex. App.—San Antonio 2002, pet. denied) ("[A] court may uphold an agreement by supplying missing terms.").

Although courts can construe undefined terms, the Court will not do so here, where the parties intentionally deleted definitions for the terms at issue. Under Texas law, the Court's primary obligation in construing a contract is "to ascertain and give effect to the

intent of the parties as that intent is expressed in the contract." *RLI Ins. Co.*, 2007 WL 2428599, at *3.  Thus, a missing term should be inferred only when "necessary to effectuate the intent of the parties." *Woodward v. Liberty Mut. Ins. Co.*, 2010 WL 1186323, at *5 (N.D. Tex. Mar. 26, 2010) (Fish, J.).  The court may "not supply an essential term that the parties did not or could not agree upon." *Fiduciary Fin. Servs. of Sw., Inc. v. Corilant Fin., L.P.*, 376 S.W.3d 253, 257 (Tex. App. – Dallas 2012, pet. denied).  Because the parties deleted definitions of key terms, the Court cannot effectuate their intent simply by adding the deleted definitions back into the contract.  *See* 11 WILLISTON ON CONTRACTS § 32:13 (4th ed. 2007) ("[D]eletion . . . manifests an unwillingness to be bound according to the deleted terms").  Similarly, where the original definition for each term was more specific than that "usually understood by persons in the profession, business or industry" the Court cannot conclude that the parties intended to use standard industry terms.  Here, the parties chose to define the terms at issue in part by specifying the surface area each defined item would occupy.   The standard industry definitions Plaintiffs ask the Court to infer do not specify surface area.  Pl. Br. [ECF No. 40], at 13.  The Court thus cannot ascertain the parties' intent regarding payment *for the amount of surface area used* by inferring such broad industry definitions.  The Court is therefore unable to determine the payment obligation, and Paragraph 17 fails for indefiniteness.

## IV.    CONCLUSION

As to the Occupied Lands Claim, Plaintiffs' Motion for Partial Summary Judgment is **DENIED** and Defendants' Motion for Partial Summary Judgment is **GRANTED**.  The Court retains jurisdiction to effectuate the settlement agreement.  The parties should submit a final judgment reflecting the parties' settlement agreement and clarifying if the parties have

agreed to reserve an appeal from this decision.

**SO ORDERED.**

November 28, 2016.

BARBARA M. G. LYNN
CHIEF JUDGE